HERCULES INC.

v.

The UNITED STATES.

No. 442–77.

United States Court of Claims.

Decided July 2, 1980.

Clarence T. Kipps, Jr., Washington, D. C., atty. of record, for plaintiff. S. Maynard Turk, Edward H. Kurth, John Lloyd Rice and Miller & Chevalier, Washington, D. C., of counsel.

Sandra P. Spooner, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant.

Before DAVIS, KASHIWA and SMITH, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case comes before the court on plaintiff's request for review by the court of the recommended decision of Trial Judge C. Murray Bernhardt, filed July 23, 1979, pursuant to Rule 166(c), on plaintiff's motion and defendant's cross-motion for summary judgment. The court has heard oral argument and has considered the briefs of the parties. Agreeing with the trial judge's recommended decision, as hereinafter set forth, the court hereby affirms and adopts that decision, together with the following paragraphs of this *per curiam* opinion, as the basis for its judgment in this case.

A major part of plaintiff's case is comprised of the twin propositions that (i) the contracting officer for the fixed-price contracts necessarily decided, in accepting plaintiff's prices for those contracts, that the method used to determine the depreciation allowance for the Hercopel Plant which was included in those fixed prices was proper and fully in accord with the pertinent provisions of Section XV of the Armed Services Procurement Regulations (ASPR), and (ii) such an approving decision by that contracting officer, taken together with the need for consistency of treatment, controls the determination of the reimbursable General and Administrative (G&A) expense for plaintiff's cost-reimbursable contracts now before us.[1] The factual predicate for con-

---

1. The court requested and received from both parties post-argument supplemental memoranda on these propositions.

sideration of those propositions—as found by the Armed Services Board of Contract Appeals and confirmed by the trial judge— is (to use the trial judge's words) that plaintiff decided "to adjust its costing practices for its fixed price contracts by understating its depreciation [on the Hercopel Plant] in order to make its prices lower and thus more competitive." [2]

■ We are satisfied that, on these facts, nothing in Section XV of ASPR, including the specific provisions plaintiff cites (*i. e.,* ASPR §§ 15–201.3, 15–203, 15–205.9), precluded the contracting officer on the fixed price contracts from accepting a fixed price which included an understated or too-low depreciation cost on the Hercopel Plant if the bidder or potential contractor wanted to proffer such a deliberately lower cost for its own competitive purposes. Conversely, the regulations did not forbid plaintiff from offering a fixed price lower than that computed according to ASPR.[3] The texts of the regulations do not forbid a contracting officer from accepting such a too-low price on a fixed-price contract, nor do they require him to reject it if offered, nor do they preclude a bidder or contractor from putting forward such a too-low price. What the regulations do is to declare the criteria for deciding what types of depreciation allowances should not be accepted because they are too high for the particular contract. Unless perhaps the proffered fixed price is so low that it might well endanger performance, there is no legal or practical requirement that the contracting officer go through each item making up the proffered price to determine whether that specific item is too low, considered by itself. In our system for bid and negotiated fixed price

contracts, that process and that determination are left to the judgment of the bidder or potential contractor. It is his choice if he wishes to cut his price for competitive ends, and there is nothing illegal or improper in his doing so.

None of the decisions on which plaintiff relies states or implies a contrary holding. In particular, they do not say or suggest that acceptance by a contracting officer of a fixed price necessarily implies that he also accepted each of the underlying components of that fixed price as proper under the ASPR standards. Rather, the deciding tribunal (this court or a board of contract appeals) has ruled for itself, in cost-reimbursement cases, that a contractor's cost accounting practices accorded, or did not accord, with the pertinent ASPR and controlling standards, where the Government contended that the claimed reimbursement was excessive and a review of the contractor's practices was necessary in order to resolve that question. We do the same here, holding that in the circumstances usage depreciation did not comply with ASPR and resulted in excessive reimbursement on plaintiff's cost-reimbursable contracts.

Accordingly, on the basis of the foregoing paragraphs and the trial judge's opinion, we hold that plaintiff's motion for summary judgment is denied, defendant's motion for summary judgment is allowed, and the petition is dismissed.

## OPINION OF TRIAL JUDGE

BERNHARDT, Trial Judge:

■ This review under the Wunderlich Act (41 U.S.C. §§ 321–22 (1976)) of a decision of the Armed Services Board of Con-

---

**2.** Earlier in his opinion the trial judge says: "Including depreciation on a straight-line basis in the factory overhead expense pool, and with a low dollar amount of direct labor as a base, the resulting overhead rate would produce noncompetitive bid prices. In its effort to provide a competitive proposal plaintiff adopted a usage method of calculating [Hercopel Plant] depreciation for purposes of pricing and charging fixed price contracts performed in that plant. Allocating [Hercopel Plant] depreciation on a usage basis substantially reduced the deprecia-

tion expense charged to government contracts and subcontracts in comparison with the depreciation expense that would have been charged by calculating [Hercopel Plant] depreciation on a straight-line basis."

**3.** There is nothing in the record to indicate that the contracting officer in actual fact approved the method used to calculate the depreciation allowances as proper under ASPR or as not too low.

tract Appeals (77–1 BCA ¶ 12,394) on claims under two Navy cost reimbursement research and development (R&D) contracts turns entirely on elusive accounting principles. In the abstract, what is accepted practice in the accounting profession is a factual inquiry. But the application of accounting rules to a finite problem raises an issue of contract interpretation, which is an issue of law. "Thus, the ultimate question is one of law, though facts are essential to its solution." *Lockheed Aircraft Corp. v. United States*, 179 Ct.Cl. 545, 553, 375 F.2d 786, 790 (1967). *See also Tri-Cor, Inc. v. United States*, 198 Ct.Cl. 187, 204, 458 F.2d 112, 122 (1972). 3 A. Corbin, Corbin on Contracts § 554 (2d ed. 1960).

Synoptically, plaintiff wishes to employ the same usage basis of depreciation in its cost reimbursable contracts under review that it was permitted to employ in its fixed price contracts being performed contemporaneously in another of its plants. A usage basis of depreciation, if allowed, would increase the reimbursable General and Administrative (G&A) expense that plaintiff could recapture in the subject cost reimbursable contracts, while at the same time decrease the prices it could offer in bidding on fixed price contracts in order to make plaintiff's bids on government work more competitive. The contracting officer, affirmed by the Board, disallowed employment of the usage formula for the cost reimbursable contracts under review, and required that depreciation for such contracts be computed on a straight-line basis for inclusion in the determination of G&A rates. From this refusal the plaintiff appeals, without avail.

The two contracts in dispute were awarded on August 25, 1967 and October 23, 1969, and required the rendition of R&D services from, respectively, July 1, 1967 through June 30, 1968, and November 1, 1969 through October 31, 1970. Each contract contains the standard Disputes Clause (ASPR 7–103.12(a), January 1958) and the clause entitled "Allowable Cost, Fixed Fee, and Payment" (ASPR 7–203.4(a)). The contracts were performed at plaintiff's Allegany Ballistics Laboratory (Plant # 1) at Cumberland, Maryland, which was primarily an R&D laboratory facility that was owned by the Navy and operated by plaintiff.

On land adjacent to Plant # 1 plaintiff constructed the Hercopel Plant (Plant # 2) which became operational by February 1968. Plant # 2 was an automated special purpose facility designed to manufacture tactical rocket motors fueled by proprietary composite propellants known as "Hercopel." The manufacture of Hercopel propellants is hazardous; hence the emphasis on automation in Plant # 2. The plant was the first new tactical rocket facility built in the United States in many years; none has been built since its completion, at least to time of trial before the Board. It consists of thirteen special purpose buildings arranged to provide for receipt of rocket parts and materials, continuous flow through the various operations required to manufacture, cure, inspect, store and ship rocket motors, and use of remote control during the most hazardous manufacturing phases. The facility was developed for two reasons: first, plaintiff needed a production facility capable of manufacturing motors in order to qualify to bid as a subcontractor to Raytheon on the Sparrow missile program; second, plaintiff anticipated growth in the solid propulsion business and hoped to capture a 20 percent share of government procurement in the composite rocket field. Plaintiff believed that an automated facility would reduce labor costs and thereby enable it to compete with manufacturers then dominating the market.

In plaintiff's corporate organization the Allegany Ballistics Laboratory (ABL) complex, including Plants # 1 and # 2, was a part of the Systems Group in plaintiff's Industrial Systems Department (ISD). The Systems Group performed virtually all of the government contracts within the company. Approximately 15 percent of Plant # 1 R&D effort went into Plant # 2 production contracts. Although Plants # 1 and # 2 were regarded as one complex, from a cost accounting standpoint each plant had a separate factory overhead rate,

and Plant # 1 used a straight-line method of depreciation while Plant # 2, a production facility, used the usage method of depreciation for costing government contracts beginning in early 1969.

The only work in process at Plant # 2 in 1968 was a firm fixed price, negotiated subcontract from Raytheon for rocket motors for the improved Sparrow missile. From 1969 through 1974 the work force at Plant # 2 totalled 12 to 30 employees, plus maintenance support personnel, always on a one shift basis. At design capacity Plant # 2 required 100 employees.

For approximately one year of the 1969–74 period Plant # 2 was completely idle. It was substantially idle for most of the period involved in this litigation. Hercules had prepared many surveys showing market projections for rocket motors of the type manufactured in Plant # 2. The protraction of the war in Vietnam diverted government defense funds to other uses, so the plaintiff's sales expectations were not realized until 1975, when orders for Plant # 2 began to increase.

For 1968, Plant # 2's first year of operation, plaintiff had proposed forward pricing rates to the government based on its survey projections which included a factory overhead rate on direct labor costs for Plant # 2 of 139.6 percent. The factory overhead rate is determined on a basis of factory overhead expense pool divided by direct labor dollars. The Sparrow subcontract under Raytheon was the only contract work then in progress in Plant # 2. The indirect costs upon which the factory overhead rate was based included depreciation expense on a straight-line basis. However, the experienced 1968 factory overhead rate was approximately 600 percent of labor costs because of the unexpectedly low production activity at Plant # 2, and hence low direct labor dollars. For tax purposes plaintiff used an accelerated (double declining balance) method of depreciation from the inception of Plant # 2 in order to minimize taxes, and used straight-line depreciation on its books and records for financial statements to stockholders and to the Securities

Exchange Commission. According to Internal Revenue Service guidelines for aerospace buildings the useful life of Plant # 2 was 8 to 10 years.

In early 1969 plaintiff was preparing to submit a proposal on the advanced standard missile system to be performed in Plant # 2. In connection with this proposal, it was recognized that low productivity in Plant # 2 combined with straight-line depreciation would produce an extremely high factory overhead rate to be factored into plaintiff's bid on this negotiated fixed price contract. Including depreciation on a straight-line basis in the factory overhead expense pool, and with a low dollar amount of direct labor as a base, the resulting overhead rate would produce noncompetitive bid prices. In its effort to provide a competitive proposal plaintiff adopted a usage method of calculating Plant # 2 depreciation for purposes of pricing and charging fixed price contracts performed in that plant. Allocating Plant # 2 depreciation on a usage basis substantially reduced the depreciation expense charged to government contracts and subcontracts in comparison with the depreciation expense that would have been charged by calculating Plant # 2 depreciation on a straight-line basis.

The usage method adopted in 1969 by plaintiff for Plant # 2, subject to government approval, was based upon an estimated volume of business during a 10-year period, and a maximum operating level of 82 percent of capacity. To compute the usage charge plaintiff divided the undepreciated acquisition cost of Plant # 2 ($4,600,000) by the estimated direct labor dollars ($16,428,000) to be expended if the plant operated at 82 percent of design capacity for the 10-year period. (Plaintiff's plant was operating at less than 10 percent capacity at this time.) This formula resulted in a 1969 usage charge of 28¢ for each dollar of direct labor. It was increased on January 1970 to 40¢ to reflect plaintiff's reevaluation of Plant # 2's useful life.

Plaintiff's plans to apply depreciation on a usage basis for Plant # 2 were submitted

to J. W. Ford, Jr., of the "Tri-Services Board" at Headquarters, Naval Material Command, by letter of March 11, 1969. Mr. Stanton of the Defense Contract Audit Agency (DCAA) suggested this procedure to plaintiff because the Tri-Services Board had the power to negotiate an advance agreement between the contractor and the government settling potentially troublesome accounting issues. After meetings between the government and plaintiff concerning the proposal the administrative contracting officer (ACO) in June 1969 denied plaintiff's request for an advance agreement which would permit plaintiff to charge depreciation of Plant # 2 on a usage rate basis of 28¢ per labor dollar.

By letter of April 15, 1970, ACO Collins notified plaintiff that its proposed factory overhead rates for Plant # 2 of 40¢ per labor dollar (increased from 28¢ to 40¢ in January 1970) were unrealistic for forward pricing purposes because there was so little production activity in Plant # 2. Collins recommended rates more in line with those rates used in Plant # 1 until such time as a more substantial labor base had been established in Plant # 2. Subsequently, Collins approved forward pricing rates for Plant # 2 overhead, including depreciation computed at a usage rate equaling 40¢ per labor dollar. Approved forward pricing rates were considered final only for negotiated fixed price contracts. As to cost reimbursable contracts the approved forward pricing rates were only provisional, in that they were subject to a final audit by the government before they became final.

In December 1970 plaintiff submitted to the DCAA suboffice at Hercules its proposal to compute a final rate for General and Administrative (G&A) expense for 1969 for plaintiff's entire ISD, including Plants # 1, # 2, and others. Plaintiff intended to include in the G&A allocation base the amount of depreciation that was allocated to government contracts under the usage method. Put another way, plaintiff proposed to delete from the G&A base the unallocated depreciation—the difference between straight-line depreciation and usage rate depreciation. Plaintiff argues that usage rate depreciation had been used in negotiating fixed price contracts and that it would be consistent and proper to use the same amount of depreciation for G&A rate determinations.

The DCAA refused to accept plaintiff's proposal to exclude the unallocated depreciation for Plant # 2 from the G&A allocation base for the entire ISD. For all ISD plants other than Plant # 2 the booked depreciation expense computed on a straight-line method was included in the cost of sales base. Now, for the first time, plaintiff was attempting to include only the usage part of the booked depreciation on the Hercopel Plant in the cost of sales base.

From an accounting standpoint plaintiff computed its G&A expense rate on a cost of sales base (G&A expense pool divided by cost of sales. The cost of sales base consists of direct costs of labor, material, and other, including factory overhead). Given a constant G&A pool of expenses, an increase or decrease in the cost of sales base by reason of adjusting upward or downward the element of depreciation contained in the factory overhead causes a corresponding decrease or increase, as the case may be, in the resultant G&A rate for allocation of G&A expenses to government contracts.

Meetings were held in October 1971 and again in February 1972 with the Coordinated Negotiations Branch (Tri-Services Board) of the Naval Material Command concerning final G&A and overhead rates for 1969. The government stood firm throughout in its position that straight-line depreciation must be included in the approved cost of sales base used for allocating G&A expense in the cost reimbursable contracts in suit.

Thereafter, plaintiff submitted two periodic payment vouchers, one under each of the two cost reimbursable contracts here under review (being performed in Plant # 1), to recover nominal amounts for G&A expense computed by including in the cost of sales base only the usage rate depreciation. DCAA Forms No. 1 were issued applicable to each contract disallowing the

amounts involved because of the exclusion of the unallocated portion of Plant # 2 depreciation from the cost of sales base to the G&A equation. Plaintiff appealed the disallowance to the Chairman of the Coordinated Negotiation Branch. The contracting officer issued a final decision on March 21, 1973, affirming the position previously taken by the Coordinated Negotiation Branch and denying plaintiff's application. Plaintiff then made a timely but unsuccessful appeal to the Board, as previously noted.

■ At the outset there is a question as to what cost standards apply. The contracts under review incorporate by reference Part 2 of Section XV of the Armed Services Procurement Regulations (ASPR), which contains guidelines for use, where appropriate, in the evaluation of costs in connection with certain negotiated fixed price contracts. In ascertaining what constitutes costs ASPR 15–201.1 authorizes the use of "any generally accepted method of determining costs that is equitable under the circumstances." Besides that standard, ASPR 15–201.2 lists as other factors affecting allowability of costs their reasonableness, their allocability, and any limitations or exclusions set forth in Part 2 of ASPR 15 or otherwise included in the contract.

Throughout its brief the plaintiff cites and relies on Cost Accounting Standards (CAS), 4 C.F.R. § 400, *et seq.*, rather than on the standards of Part 2 of ASPR XV. Defendant objects to this, contending that the CAS are inapplicable. They were not mentioned in the contracts in suit. Furthermore, they were effective only as to contracts awarded after July 1, 1972 (4 C.F.R. §§ 400.2, 401.10), whereas the contracts in suit were awarded in 1967 and 1969 and covered services to be rendered from July 1967 through October 1970. The CAS were promulgated for use by defense contractors and subcontractors and by relevant federal agencies in estimating, accumulating, and reporting costs of negotiated defense contracts and subcontracts exceeding $100,000.

The plaintiff recognizes that the CAS are not included in the contracts, but contends that they are nevertheless a formal government statement of general cost accounting principles which are "useful by analogy" in determining the appropriate components of the cost of sales base that plaintiff used to allocate G&A expense. In this connection plaintiff cites as an analogy *Lockheed Aircraft Corp. v. United States*, 179 Ct.Cl. 545, 375 F.2d 786 (1967), in which the court relied on ASPR Section XV as "a composite of sound accounting rules" even though it was not in effect during the performance period of the three fixed price incentive contracts there in suit and was not incorporated into such contracts, each of which, however, contained a Fixed Price Incentive Clause defining in inconclusively vague terms contract costs and procedures for their determination, including an instruction that the contractor should keep cost records "in accordance with generally accepted accounting principles." In reaching this conclusion the *Lockheed* court observed that the ASPR cost principles "are not liberal", that, although they were at that time limited to cost-reimbursement contracts, contracting officers in practice used them as a guide in negotiating fixed price incentive contracts, and that generally accepted accounting principles should be used with caution in determining allocability of costs to government contracts because they are not cost accounting principles but have been developed for purposes of asset valuation and income measurement. Presumably the last objection may be cured by the later version of ASPR Cost Principles applicable to the contracts under consideration since they expressly state that they provide guidelines for use in the evaluation of negotiated fixed price contracts and authorize resort to any generally accepted method of accounting in ascertaining what constitutes costs or in estimating equitable costs.

From these facts the only utility of the CAS will be for analogical purposes should Section 2 of ASPR XV and the advice of the experts leave the answers to accounting issues inconclusive and vague. No reason is perceived to expect a conflict between the two, but the contracts direct adherence to

the ASPR's to the extent they apply, as the Board held and the defendant maintains.

As an issue fully dispositive of the case plaintiff argues that the Board erred legally in failing to decide that the cost of sales base used to allocate plaintiff's G&A expenses should include the same amount of depreciation on Plant # 2 that was charged to plaintiff's fixed price government contracts. Plaintiff also contends that the Board erred as matters of law and/or fact in (1) failing to decide that if Plant # 2 experienced market obsolescence (as the Board found) plaintiff was still entitled to recover because such obsolescence should be excluded from the cost of sales base used to allocate G&A expense, and in finding, (2) the usage method did not comply with ASPR 15–205.9, (3) the usage method was not in accord with generally accepted accounting principles, (4) Plant # 2 suffered market obsolescence, and (5) the usage method was inappropriate in determining plaintiff's plant depreciation.

Plaintiff's principal argument is that the cost of sales base used to allocate its G&A expenses to its cost reimbursable contracts in suit should include the same amount of depreciation on Plant # 2 that was included in the cost of sales charged to plaintiff's fixed price contracts. Its reasoning is that in order to prevent an over or under recovery of G&A expense, G&A allocation principles require that only the costs charged to contracts can be included in the cost of sales base used to allocate G&A expense. Thus, runs the argument, if the cost of sales charged to contracts in an accounting period is less than the cost of sales used as an allocation base, the contractor will recover less G&A expense than was actually incurred, and the converse would be true. Plaintiff offers CAS 401.40 as support for the principle of consistency on which it relies.[1]

■ Plaintiff errs. It was plaintiff's decision to adjust its costing practices for its fixed price contracts by understating its depreciation in order to make its prices lower and thus more competitive. If that caused plaintiff to lose money on its fixed price contracts it cannot make it up by increasing its G&A rate in the cost reimbursable contracts in suit through employing a usage basis of depreciation in the cost of sales base used in allocating its G&A expense. No known rule of accounting entitles a contractor to recover his entire G&A expense if he deliberately induces a loss in order to gain a temporary competitive advantage.

Plaintiff asserts that the Board has recognized and applied the principle that only costs charged to or priced in contracts should be included in the base for allocating G&A expense, citing *Martin Marietta Corp.*, 71–1 BCA ¶ 8,783, *American Electronic Laboratories, Inc.*, 65–2 BCA ¶ 5,020, and *Harza Engineering Co.*, 73–2 BCA ¶ 10,282. These cases actually hold that when the government or the contract itself disallows a certain item of cost, that item should not be included in the base.

Again resorting to the CAS for support, plaintiff cites an illustration at 4 C.F.R. § 410.60(d)(2), which notes that the cost of raw materials should not be included in the G&A base until they have been charged out to contracts or other cost objectives. Overlooking the fact that the CAS do not apply to the contracts before the court, a "cost objective" is defined at 4 C.F.R. § 410.-30(a)(4), as "A function, organizational subdivision, contract or other work unit * *." Since straight-line depreciation had been charged to Plant # 2 (an "organizational subdivision") on plaintiff's books, it was appropriate to include straight-line depreciation in the G&A cost of sales base even under the CAS.

■ Plaintiff next contends that, if the Board was correct in ruling that Plant # 2 experienced market obsolescence, it is entitled to recover because Plant # 2 obsolescence should be excluded as an extraordina-

---

1. "A contractor's practices used in estimating costs in pricing a proposal shall be consistent with his cost accounting practices used in accumulating and reporting costs." 4 C.F.R. § 401.-40(a).

ry expense from the cost of sales base used to allocate G&A expense. The Board held that market supercession or obsolescence of Plant # 2 occurred in 1969 when the anticipated market failed to materialize, long before its physical facilities were exhausted. Plaintiff's argument is academic. It did not choose to compute its depreciation in this manner, and it cannot be assumed that the government would have agreed to such a computation. Even if plaintiff could have used another method of depreciating Plant # 2 permitting it to price contracts by charging either no depreciation or only a use charge in lieu thereof, it does not follow that the usage method it actually used was appropriate in computing the G&A rate.

Plaintiff further says that the Board erred in holding that the usage method of depreciation is not in accordance with generally accepted accounting principles, that it did not comply with ASPR 15–205.9, and that it was inappropriate in determining plaintiff's Plant # 2 depreciation. The Board found that the usage method of depreciation is quite similar to the "units of production" method used by plaintiff at its commercial production plants, and as well to the "working hours" and the "production" methods described at page 312 of Finney and Miller, Principles of Accounting (6th Ed. 1965), in that all of these methods are "designed to distribute depreciation among the periods in proportion to the use made of the asset during each period when service units can be rather definitely estimated and when the service is not uniform by periods." However, the Board then ruled that the usage method is not in accordance with generally accepted accounting principles for application to the present situation because it fails to take into account the obsolescence of Plant # 2 resulting from diminished market potential, which obsolescence develops on a time related basis rather than on the basis of units of output. Thus, at the rates of production

being experienced by Plant # 2, a period of 47 to 100 years would be required before the facility would be fully depreciated on the usage method, as contrasted to the useful life of 10 years on which plaintiff had formulated its usage method.

Plaintiff cites CAS 409 in support of its contention that the usage method was suitable for application, in that according to the reference a method of depreciation should reflect the pattern of consumption of services over the life of the asset, whereas in contrast the straight-line method of depreciation is appropriate "where the expected consumption of asset services is reasonably level over the service life of the asset." In other words, the plaintiff urges that, if production at Plant # 2 were greater or less than the normal design rate, the usage method would produce an increased or decreased depreciation charge as appropriate.

Whether the usage method of depreciation is in accordance with generally accepted accounting principles is clearly a question of fact, and the conclusion of the Board that it is not, in the present situation, is a finding of fact that must be affirmed if it is supported by substantial evidence, even though the administrative record would support different or contrary findings as well. Plaintiff's own expert accounting witness stated that the usage method as employed by plaintiff is not in accord with generally accepted accounting principles. The government's highly qualified expert accounting witness [2] corroborated this conclusion.

■ The basic flaw in plaintiff's reasoning is that the usage method of depreciation as applied by plaintiff in the present instance fails to meet the objectives of the accounting methods which apportion depreciation according to production because it does not correctly attribute the units over the normal useful life of the asset. When a fixed asset such as Plant No. 2 is subject to

**2.** Dr. Wright, the government's witness, possesses unique credentials on the subject. He has not only authored two books and some 65 articles in professional accounting journals relating to accounting for defense contracts, but participated in the preparation of Section XV of the ASPR's. He has testified frequently for both the government and private companies as an expert witness and is a recognized authority on accounting principles.

obsolescence the production method is illogical. The fact that plaintiff uses a units of production method of depreciation at its commercial plants does not sanction the use of the related usage depreciation method in allocating depreciation to Plant # 2. The Board's observation that the plaintiff's use of the usage method was a significant change from plaintiff's established practices referred to the fact that plaintiff had always used the straight-line method of depreciation for Plant # 2 until it discovered the benefits of switching to the usage method in order to increase the G&A rate in its cost reimbursable contracts.

■ Finally, plaintiff disputes the Board's finding that Plant # 2 experienced market obsolescence soon after it began operations. Plaintiff's expert accounting witness considered that there were never enough sales to justify even a 10-year useful life upon which plaintiff's usage method of depreciation was based, and that the "useful life * * * should probably have been one day and the plant written off * * when the market survey showed there was going to be very, very little business." At the time in 1969 that plaintiff adopted the usage method it could not have assumed that sales for Plant # 2 would increase to a volume justifying the 10-year life for the plant upon which the usage method was predicated. The resumption of sales volume in 1975 does not alter the fact that as of 1969 Plant # 2 was obsolete from a standpoint of a prospective market. Nor does the record show that sales beyond 1975 would have proved the creation of a significant market for the products of that facility.

It is recommended that plaintiff's motion for summary judgment be denied, defendant's motion for summary judgment be allowed, and the petition be dismissed.