**DENRO, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 140–88C.

United States Claims Court.

Jan. 17, 1990.

Donald K. Dankner, Washington, D.C., atty. of record, for plaintiff. James H. Roberts, III, Steven J. Riggs, and Bishop, Cook, Purcell & Reynolds, of counsel.

Evelyn M. Korschgen, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, for defendant. David M. Cohen, Director, Thomas W. Petersen, Asst. Director, Gordon D. Kromberg, Mark A. Sagan, Chief, Adversary Proceedings Div., and Steven R. Knowlton, Headquarters, CECOM, of counsel.

## OPINION

FUTEY, Judge.

This case is before the court on plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment. Plaintiff is seeking recovery in the amount of $153,915.00 plus interest, for modification costs incurred in producing a first article Air Traffic Control Communications System for defendant under a firm fixed price contract. Defendant denies owing any sums to plaintiff and contends that the modification costs are research and development expenses that should have been expensed immediately and included in the firm fixed bid.

### Factual Background

On October 16, 1980, the United States Army Communication Material Readiness Command at Fort Monmouth, New Jersey, issued a Letter Request for Technical Proposals, Solicitation No. DAA B07–80–R–0635 (solicitation) for the acquisition of approximately 42 Air Traffic Control Communications Switching Systems (systems), plus one first article.[1] The solicitation sought a firm fixed price for the "commercial off the shelf equipment" system pursuant to a competitively bid two-step procurement. To ensure that a contractor met defendant's requirements, the solicitation required a contractor to "engineer, furnish and install" an acceptable first article before it could proceed with full production. The solicitation also provided that defendant may, at its option, order spare parts at a negotiated price.

---

1. Eventually, defendant ordered six air traffic control systems over and above the 42 governed by the contract.

Plaintiff responded to the solicitation and in its Step 1 technical proposal it set forth a detailed explanation of an appropriate system tailored from plaintiff's Model 400, which was an existing "off the shelf" product. The following is a discussion of some of the technical modifications and design enhancements which were made by plaintiff on the Model 400 to accommodate defendant's specifications for the first article system:[2]

*Specific console design.* Plaintiff was required to design and manufacture three different types of air traffic control consoles: (1) radar control consoles; (2) local control/ground control consoles; and (3) operations consolettes.

*24–Hour Clock and Barometric Altimeter Display.* Defendant specified a twenty-four hour digital clock and a digital altimeter display which included a pressure sensor, a "computer" to translate changes in atmospheric pressure, and a display in the consoles. Plaintiff put masterclock circuitry in the digital clock area to keep clock displays in sync. In addition, modifications were made to the logic in the boot processors to accept input from the clock and altimeter boards.

*Navigational Aid Display.* Defendant desired a set of visual alarms to indicate a failure of the navigation aid. These alarms were incorporated with the Model 400's standard voice switch as part of the crash alarm consoles.

*Primary/Standby Selection Input Data/Radio Device Interface Card.* The Model 400 had separate interface boards at the central equipment for the main and standby radio paths. Plaintiff designed a special module to do the switching from main to standby radio. This module includes a circuit back to the boot processor that indicates which radio has been selected.

*Light Coordination Procedure and Data Input Unit.* This unit operates as a visual back-up process for the standard audio communication between air traffic controllers to alert them when an aircraft travels from one controller's airspace to another.

*Power Changes.* The Model 400 system operates on standard 60 cycle 115 volt power. Defendant specified that the system had to work on 50 cycle 220V power as well so that it could be used in Europe.

*Crash Alarm Console.* Plaintiff developed a self-contained crash alarm panel to enable the air traffic controller to contact up to six different sites at once.

*Remote Control Radio Access Control.* Army tower operations at some posts close at night. At this time the post's operations center takes control of the radios from the tower. A button on the crash alarm console was installed to permit transfer of 5 tower radio frequencies to the operations center.

*Remote Positions.* Plaintiff enhanced the Model 400 system's ability to transmit audio and data communications because defendant contemplated using remote stations hooked into the tower.

*Primary/Standby Selection Input Data.* Plaintiff modified its Model 400 system to enable an air traffic controller to manually switch radios from one channel to another by using a jack panel. The Model 400 was designed to program radio channel usage electrically. Plaintiff designed a system to allow normal switching while also preventing accidental switching between primary and standby radio during transmission.

Plaintiff did not submit any prices with its Step 1 technical proposal in accordance with the solicitation. Defendant determined that plaintiff's technical proposal was acceptable and asked plaintiff to submit a Step 2 sealed bid.

On October 27, 1981, the sealed bids were opened. Of the five bids received, plaintiff was the low bidder with $2,614,561.00. In particular, plaintiff bid $213,466.00 as the cost to create a first article based on the modifications.

By letter dated October 29, 1981, the Contracting Officer (CO), requested that

**2.** Plaintiff's Motion for Summary Judgment, Appendix pp. 20–29.

plaintiff verify its entire bid. This request directed plaintiff to "thoroughly evaluate and consider the elements of cost" in the proposal and to verify inter alia that plaintiff had a "complete understanding of the technical requirements of the solicitation and an ability to meet all the technical requirements in production and test of first article and production items." The letter further specified that "[a]ll other areas of cost you may incur should also be revised and evaluated." The CO stated on behalf of defendant that "we have reason to believe that a mistake *may* have been made in the preparation of your bid. The CO cautioned that "[i]n the event that a review of your bid disclosed that errors or omissions occurred in preparation of your bid price," specific information concerning the alleged mistake should be submitted to defendant. The CO concluded by referring plaintiff to Defense Acquisition Regulation (DAR) § 2–406 (32 C.F.R. § 2–406 (1981), entitled "Mistake in Bid") for information and guidance.

On November 6, 1981, plaintiff notified defendant of its bid review as follows:

Further we verify:

*Our review disclosed no errors or omissions in the preparation of the bid. Our intended bid is the bid as submitted ... we have a complete understanding of the technical requirements of the solicitation* and the ability to meet all the technical requirements in production and test of the first article and production items ... *adequate costs for first article test procedures for Phases I and II were included in our bid prices. Over the past two years, we have independently developed the Model 400 as a part of our ongoing Research and Development.* Those development costs were not discretely allocated to this bid. We are therefore bidding modified off the shelf commercial equipment. Due to the advanced stage of development of the 400, *we have a thorough under-*

*standing of the technical requirements and can accurately predict the costs of both the first article and production items.* [Emphasis added.]

In developing its Step 2 bid price, plaintiff projected first article costs of $719,-446.00.[3] This represented the cost of modifying Model 400 to defendant's specific technical requirements.[4] However, rather than bid the full cost of $719,466.00, plaintiff reduced the bid price for the first article by over $500,000.00, from $719,466.00 to $213,466.00. Plaintiff believed that the $719,466.00 represented an accurate estimate of producing the first article, but it nevertheless reduced the bid price because it expected to defer and capitalize the amount of the bid reduction over future business. Specifically, plaintiff believed that defendant had requirements for more than the 42 systems solicited and thought that there may be future demand for spare parts. Plaintiff reasoned that since this future business would benefit from the engineering effort associated with the production and modification to create the first article, the future business should therefore carry some of the modification cost. In general, plaintiff thought that deferring and capitalizing costs for which there is a reasonable expectation of future recovery was a sound accounting and business practice.

In December 1981, defendant awarded the contract to plaintiff and on December 24, 1981, defendant issued delivery order 0001 for the first article and other items in the amount of $359,793.00.

In June 1984, defendant exercised its option under the contract to order spare parts from plaintiff at a negotiated price. By letter dated July 11, 1984, plaintiff submitted its price proposal in the amount of $1,490,244.84 which included a nine percent charge labeled as "Army Dev. 9%". On July 16, 1984, plaintiff submitted an addi-

---

3. Joint Stipulation of Uncontroverted Facts p. 6.

4. The costs incurred in tailoring the Model 400 to defendant's requirements have been referred to by plaintiff as "deferred research and devel-

opment", "deferred modification", "Army development" and "work-in-process". They will be primarily referred to here as "modification costs."

tional cost breakdown for the charges *inter alia* stating:

> However, since the contract award, plaintiff has spent approximately $640,000 tailoring the existing product to the Army's requirements. The charge for Army Development then represents amortization of those future sales of the Model 400 to the Army (systems 43–67 and spares for systems 1–67). Total estimated value of $7.1 million divided into $650,000.00 yields nine percent.

On November 1, 1984, plaintiff submitted a *revised* cost proposal in the amount of $1,368,164.00 for the spare parts which included an "Army Development" cost of four percent (4%), or $52,622.00. In a report dated December 13, 1984, the Defense Contract Audit Agency (DCAA) evaluated plaintiff's proposal, denied the "Army Development" costs and concluded that these costs represented a cost overrun on the first article.

On January 15, 1985, plaintiff submitted to defendant another contract pricing proposal summary for the spare parts. This proposal totaled $1,329,726.83 and did *not* include recovery of "Army Development" costs. In addition, this proposal was based on an agreement with defendant that the "Army Development" costs would be subject to negotiation after defendant's issuance of orders for spare parts and additional air traffic control systems.

By letter dated March 1, 1985, plaintiff submitted yet another revised cost proposal for the spare parts which states in pertinent part:

> Our proposal allocates a portion of deferred research and development costs to the price for repair/spare parts. These costs were accumulated subsequent to contract award in support of Denro's research and development effort to design the First Article. Company records, which have been reviewed by the Defense Contract Audit Agency, indicate that the cost of developing the First Article was $907,749.22 of which $360,801.00 was funded by the government after ac-

ceptance and delivery of the system. The balance of $547,330.02 has been capitalized with the expectation of recovering it in the future. Denro will apply such deferred costs to the business as it is acquired and benefitted by the prior expenditure. The practice of deferring costs of research and development is in accordance with generally accepted accounting principles.

Later that month, the DCAA responded, expounding in part:

> We feel that, based upon all data available to us, the costs referred to as "Army Development Costs" were costs associated with a single contract, incurred by Denro in order to sell the item on the contract to the Government, and that Denro is now attempting to recover a loss on the original contract through including this amount on future procurements. We feel that such action is specifically prohibited under DAR 15–205.19 and/or 15–205.35(e) since these costs represent costs as defined under DAR 15–109(f).

> The difficulties experienced in reviewing costs proposed for follow-on/changes to the contract are compounded when attempts are made to determine actual costs incurred on prior order or contracts. The nature of the contracts (firm-fixed-price) do not require the contractor to segregate costs between or among basic contract costs or costs applicable to changes or modifications. At the same time the access to contractor records for audit purposes is severely limited under a firm-fixed-price contract. ... [D]ata that we have reviewed relating to this item *indicates that any decision to defer this cost was not instituted until 1983 at which time this deferred item appeared on year end financial statements.* This is a clear indication to us that *a decision to defer was not made in 1981 prior to contract award, but in 1983 after the cost overrun occurred....* [Emphasis added.][5]

---

5. Plaintiff contends that it capitalized the modification costs that it intended to defer on its

1982 balance sheet by classifying the costs as "work-in-process" costs. "Under ASPR regula-

On May 14, 1985, the DCAA made a re-audit of plaintiff's modification costs but did not change its position. One year and one day later, on May 15, 1986, the DCAA again reviewed its audit of plaintiff and concluded in part as follows:

It is our opinion, based upon the information available to us, that Denro in fact did not perform satisfactorily within the constrains of the negotiated first article price and did in fact exceed the negotiated price in order to gain first article acceptance. The analysis provided by Denro of the first article cost ... shows that these "Army Development Costs" were incurred after contract award and well into the second year of contract performance and prior to the first article acceptance date.... The $547,330 difference [between the cost incurred to design the first article of $360,801] represents a cost overrun (or a loss on contract performance). Any charging of such losses to other contracts is strictly prohibited by regulation, specifically ASPR 15–205.19, which was in effect at the time.
The claim by Denro is clearly in our opinion, an attempt to recover from the Government monies spent in performing under a fixed price contract, that exceeded the price agreed to be Denro when they signed the contract. This is a cost overrun on the first article and a risk assumed by Denro. It should not be paid on any items purchased from Denro.

Meanwhile, the parties successfully negotiated for spare parts and agreed on all cost items except the modification costs. To expedite production and delivery of the spare parts, plaintiff agreed to accept an unpriced delivery order which reflected an allocation of the modification costs. Therefore, defendant first issued unpriced delivery order 0055, with a ceiling price of $1,326,305.40, and subsequently, on September 20, 1985, defendant issued order 0055–02, which requisitioned additional spare parts and resulted in an increase in the ceiling price from $1,326,305.40 to $1,448,187.80. In addition, on September 15, 1986, order 0055–03 was issued which contained another spare parts order and a ceiling price of $749,948.42. All the above ceiling prices included plaintiff's allocations of the modification costs which in total amounted to $153,915.00.

After issuance of these orders, the parties were still unable to resolve the modification cost issue through negotiations. On February 18, 1987, plaintiff requested a final decision on its claim for costs.[6] By letter dated February 20, 1987, the CO advised plaintiff that under generally accepted accounting principles (GAAP), the deferral and allocation of the modification costs was not permissible and therefore plaintiff was not entitled to recovery of these costs. Defendant also stated that if plaintiff disagreed with this position, it was entitled to submit a claim under the Contract Disputes Act. Later that month, on February 27, 1987, the CO forwarded to plaintiff documents unilaterally definitizing delivery order 0055–03 under the contract in the amount of $2,007,583.83. The CO notified plaintiff that "the deferred research and development costs proposed by plaintiff" were deleted for the reasons set forth in defendant's letter of February 20, 1987.

On June 3, 1987, plaintiff submitted its claim to defendant for recovery "of $153,-915.00 which represents the deferred research and development costs which plaintiff allocated to the price for spare parts" under the delivery orders. Plaintiff claimed these costs under the contract, the cost principles of the Federal Acquisition Regulations (FAR) and under GAAP because they were "incurred to tailor the

---

tions applicable at the time of contract award, plaintiff was not required to maintain separate, segregated accounts in order to maintain a deferred capitalized account because the nature of firm-fixed price contracts does not require the contractor to segregate costs between or among basic contract costs or costs applicable for changes or modifications. In later balance sheets, once most of the work had been completed on the first article, plaintiff removed the costs from 'work-in-process' and capitalized the costs under a separate 'Army Development' account". Joint Stipulation of Uncontroverted Facts p. 8.

6. Previously, on January 9, 1987, defendant notified plaintiff that the "Army Development Costs" were not allowable under the contract.

existing Denro 400 system to meet the Army requirements".

On September 30, 1987, the CO issued a final decision which denied plaintiff's claim, *inter alia* stating:

The Government's position is that no allocation of "Army Development" costs is permissible under accepted accounting principles.

No allocation is permissible because under generally accepted accounting principles, the deferral of development costs is not acceptable. This accounting restriction was established in October 1974 for fiscal years beginning on or after January 1, 1975 by the Financial Accounting Standards Board in Standard No. 2.... Paragraph 12 of FASB reads as follows: "All research and development costs encompassed by this Statement shall be charged to expense when incurred." Denro's claim is based on a deferral of what it labels as research and development costs; there would be no claim if Denro had expensed such costs to the period when incurred. Denro's bid, the incurrence of the costs, and the deferral periods all occurred after January 1, 1975, the effective date for Standard No. 2.

Denro has based its entitlement to the "Army Development costs" on *Northrop Corp.*, ASBCA No. 14763, 72–1 BCA 9344 [1972 WL 1216]. In that case Northrop had a longstanding, written accounting policy to defer such costs, in effect at the time it bid [on] the contract. Denro has not established the existence of such a policy and has admitted that it was not in writing.

Furthermore, *Northrop* is no longer applicable because of the current generally accepted accounting standards. In *Northrop* the significant events occurred in the 1967–1972 timeframe; the contract award was September 28, 1967 And the

costs were incurred sometime prior to February 29, 1972, the date of the decision. Subsequently, for fiscal years beginning January 1, 1975, the Financial Standards Board ruled that research and development costs could not be deferred to future accounting periods.

For the reasons set forth above, your claim in the amount of $153,915.00 is denied in its entirety.

Plaintiff filed suit in this court on March 3, 1988, to establish entitlement to the costs at issue, $153,915.00, plus interest and reasonable attorney's fees. Oral argument was heard on the cross-motions for summary judgment June 13, 1989 and post-argument briefs were filed by July 21, 1989.

## Discussion

### A. Jurisdiction

Plaintiff alleges jurisdiction under the Contract Disputes Act (CDA), codified at 41 U.S.C. §§ 601–13 (1978). The CDA applies to any express or implied contract entered into by defendant for procurement of property other than real property in being. 41 U.S.C. § 602(a)(1). Accordingly, jurisdiction is proper here under the CDA.[7]

### B. Summary Judgment

Summary judgment is appropriate where the pleadings raise no genuine dispute as to any material fact and, as a matter of law the moving party is entitled to judgment. RUSCC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing an absence of evidence to support the non-movant's case. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The party opposing the motion for summary judgment has the burden of showing sufficient evidence, not necessarily admissible, of a genuine issue

---

**7.** Although plaintiff's complaint to the CO and the CO's decision to deny the claim were based on a characterization of the costs in dispute as "deferred research and development" costs, whereas in this court they were characterized as "deferred modification" costs, the set of operative facts underlying plaintiff's claim have re-

mained the same. This court has made clear that "if the complaint brought here is based on the same set of operative facts underlying the claim presented to the contracting officer, then this court has jurisdiction under the Contract Disputes Act." *Cerberonics, Inc. v. United States*, 13 Cl.Ct. 415, 417 (1987).

of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Any doubt over factual issues must be resolved in favor of the party opposing summary judgement, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefit of all presumptions and inferences runs. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

■ The issue before this court is whether plaintiff is entitled to recover modification costs for a first article Air Traffic Control Communications System through an option to purchase spare parts provision of a firm fixed price contract with defendant. The heart of the issue is a determination of the proper nature and treatment of the modification costs. This determination, which calls for an interpretation of regulations incorporated into the contract, is a question of law which this court is free to resolve. *United States v. Boeing*, 802 F.2d 1390, 1393 (Fed.Cir.1986) (citation omitted). Accordingly, summary judgment is appropriate in the instant case.

*Allocation of costs*

The contract incorporated the standard pricing of adjustments clause which provides that "when costs are a factor in any determination of a contract price adjustment ... such costs shall be in accordance with ... Armed Service Procurement Regulations as in effect on the date of this contract"[8] 32 C.F.R. § 7–103.26 (1981). The Defense Acquisition Regulation (DAR)[9] clause which substantially addresses the issue here provides:

Factors to be considered in determining the allocability of individual items of cost include (i) reasonableness, (ii) allocability, (iii) standards promulgated by the Cost Accounting Standards Board, if applicable, otherwise, generally accepted accounting principles and practices appropriate to the particular circumstances, and (iv) any limitations or exclusions set forth in this Part 2, or otherwise included in the contact as to types or amounts of cost items.

32 C.F.R. § 15–201.2 (1981).

In addition, "costs identified specifically with the contract are direct costs of the contract and are to be charged directly thereto." 32 C.F.R. § 15–202(a) (1981).[10] As applied in this case, 32 C.F.R. § 15–202 (1981), requires that all costs directly associated with plaintiff's efforts to modify the Model 400 to meet the technical requirements of the contract are to be allocated to the fixed price portion of the contract.

Here, plaintiff allocated some of the modification costs directly to the first article submitted under the fixed price portion of the contract. However, the modification costs that plaintiff now seeks to recover were treated as indirect costs and were in the form of a percentage charge included in the negotiated option price proposal for spare parts.[11]

■ According to 32 C.F.R. § 15–202 (1981), plaintiff could not allocate some of the modification costs directly to the fixed price portion of the contract and then defer the balance as indirect costs for expected future orders. This balance would not be allowable under 32 C.F.R. § 15–201.2(iv) (1981).

In conclusion, plaintiff's treatment of the modification costs, in light of the fact that it was entering into a firm fixed price con-

---

**8.** These regulations were later named the Defense Acquisition Regulations (DAR), 32 C.F.R. §§ 1–39 (1981).

**9.** The DAR was superseded by the Federal Acquisition Regulations (FAR), 48 C.F.R. §§ 1–51 (1984). The FAR is applicable to contracts solicited and entered into on or after April 1, 1984.

**10.** A direct cost is any cost which identified specifically with a particular final cost objective. "Direct costs are not limited to items which are incorporated in the end product as material or labor. Costs identified specifically with a contract are direct costs of that contract. All costs identified specifically with other final cost objectives of the contractor are direct costs of those cost objectives." 32 C.F.R. § 15–109(f) (1981).

**11.** See plaintiff's cost breakdown dated July 16, 1984, p. 6.

tract, was incorrect. Plaintiff failed to correct its bid at the time that defendant requested bid verification. Instead, plaintiff verified its bid as correct, even though it knew that it could have included its total cost estimates for the first article in its bid without losing the contract. Plaintiff cannot move its firm fixed price bid losses, either planned or unplanned, to the option for spare parts. "An essential quality of firm fixed price contracts is that the contractor assumes responsibility for his costs with the inevitable risk that greater costs will be incurred and that a loss on the contract can result." *A.C. Ball Co. v. United States,* 209 Ct.Cl. 223, 248–249, 531 F.2d 993 (1976) (citations omitted); 32 C.F.R. § 1460.12(b) (1974); *McNamara Contr., Ltd. v. United States,* 206 Ct.Cl. 1, 8, 509 F.2d 1166 (1975) (citations omitted). Consequently, plaintiff's allocation of the modification costs to the spare parts option was incorrect.

### Research and development

Defendant contends that the modification costs are deferred research and development (R & D) costs and that the accounting treatment of the modification costs by plaintiff was not in compliance with GAAP, which makes the costs both unallowable and unrecoverable under 32 C.F.R. § 15–201.2(iii) (1981).[12] The application of accounting principles requires contract interpretation which is an issue of law appro-

priate for this court. *Hercules, Inc. v. United States,* 224 Ct.Cl. 465, 470, 626 F.2d 832 (1980).

GAAP is a term of art for describing how the transactions and events of a business are measured, recorded and classified in accordance with a conventional format. *SEC v. Arthur Young & Co.,* 590 F.2d 785, 789 n. 4 (9th Cir.1979).

Furthermore, the Fifth Circuit explains GAAP as follows:

Standard accounting practice recognizes a hierarchy of ... [GAAP] comprised of general principles that pervade the practice of accounting, followed by the published standards of American Institute of Certified Public Accountants ("AICPA"), followed by the prevalent customs and usages of the accounting profession, and completed by the remaining extant literature in the accounting field (citation omitted). The heart of this system of accounting norms is the standards which AICPA's Financial Accounting Standards Board (FASB) publishes (citation omitted).

*Godchaux v. Conveying Techniques, Inc.,* 846 F.2d 306, 315 (5th Cir.1988).

Through a series of published statements, the accounting profession's Financial Accounting Standards Board (FASB) promulgates GAAP "which are the conventions, rules and procedures that define accepted accounting practices." [13] *United States v. Arthur Young & Co.,* 465 U.S.

---

**12.** The standards promulgated by the Cost Accounting Standards Board (CASB) are not applicable to this case. 4 C.F.R. § 331.30(b)(9) (1981) (exemption from CASB standards to "any firm fixed price contract awarded without submission of cost data: *Provided,* That failure to submit such data is not attributable to a waiver of the requirement for certified cost or pricing data"). In addition, where cost accounting standards are not applicable to the initial contract award, they are not applicable to price adjustments. *See* 37 Fed.Reg. 4139 (1972).

However, even if cost accounting standards (CAS) were applicable, plaintiff would be precluded from recovery. 4 C.F.R. § 402.40 (1981) ("All costs incurred for the same purpose, in like circumstances, are either direct costs only or indirect costs only with respect to final cost objectives"). The CASB defines the term *Direct cost* as "any cost which is identified specifically with a particular final cost objective ... costs

identified specifically with a contract are direct costs of that contract." 4 C.F.R. § 402.30(a)(3) (1981). The term *Indirect costs* is defined by CASB as "any cost not directly identified with a single final cost objective, but identified with two or more final cost objectives or with at least one intermediate cost objective." 4 C.F.R. § 402.30(a)(5) (1981).

Plaintiff could not allocate some of the modification costs *directly* in the fixed bid price to produce a first article and the rest of the costs *indirectly* to the option portion for spare parts. This treatment of costs is a violation of CAS as stated in 4 C.F.R. § 402 (1981).

**13.** "Until 1974 the American Institute of Certified Public Accountants (AICPA) was the source of authoritative accounting and auditing pronouncements. That role has been assumed by the FASB since 1974." *Matter of Hawaii Corp.,* 567 F.Supp. 609, 618 (D.Haw.1983).

805, 811 n. 7, 104 S.Ct. 1495, 1499 n. 7, 79 L.Ed.2d 826 (1984) (citations omitted); *Spokane Valley General Hospital, Inc. v. United States*, 231 Ct.Cl. 550, 557 n. 4, 688 F.2d 771 (1982); see *HCA Health Services of Midwest, Inc. v. Bowen*, 869 F.2d 1179, 1181 n. 3 (9th Cir.1989) (citation omitted).

The FASB addresses R & D in its statement number 2 (FAS 2):

> a. Research is planned search or critical investigation aimed at discovery of new knowledge with the hope that such knowledge will be useful in developing a new product or service (hereinafter "product") or a new process or techniques (hereinafter "process") or in bringing about a significant improvement to an existing product or process.

> b. Development is the translation of research findings or other knowledge into a plan or design for a new product or process or for a significant improvement to an existing product or process whether intended for sale or use. It includes the conceptual formulation, design, and testing of product alternatives, construction of prototypes, and operation of pilot plants. It does not include routine or periodic alterations to existing products, production lines, manufacturing processes, and other on-going operations even though those alterations may represent improvements and it does not include market research or market testing activities.

FASB, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS No. 2, (October 1974).

FAS 2 explicitly describes the treatment of R & D costs: *Any research and development costs encompassed by this statement shall be charged to expense when incurred.*[14] To be in accordance with GAAP, R & D costs in the scope of FAS 2 must not be deferred and amortized, rather they must be accounted for as an expense in the firm fixed price bid.

Definitions of R & D are:

(a)(1) *Basic research* is that research which is directed toward increase of knowledge in science. The primary aim of basic research is a fuller knowledge or understanding of the subject under study, rather than any practical application thereof.

(a)(2) *Applied research* is that effort which (A) normally follows basic research, but may not be severable from the related basic research, (B) attempts to determine and exploit the potential of scientific discoveries or improvements in technology, materials, processes, methods, devices or techniques, and (C) attempts to advance the state of the art. Applied research does not include efforts whose principal aim is design, development, or test of specific items or services to be considered for sale; these efforts are within the definition of the term "development" defined below.

(a)(3) Development is the systematic use, under whatever name, of scientific and technical knowledge in the design, development, test or evaluation of a potential new product or service (or of an improvement in an existing product service) for the purpose of meeting specific performance requirements or objectives. *Development* includes the functions of design engineering, prototyping and engineering testing. Development excludes subcontracted technical effort which is for the sole purpose of developing an additional source for an existing product.

32 C.F.R. § 15–205.35(a) (1981).

▆ Applying the definitions in FAS 2 and 32 C.F.R. § 15.205.35(a) (1981), this

---

**14.** The practice of capitalizing research and development (R & D) costs and amortizing them over the periods benefited was common at one time, but the Financial Accounting Standards Board (FASB) no longer permits it because there is no objective method for determining which R & D effort will derive future benefit and what the duration of any benefit would be. In essence, R & D is inherently uncertain.

Although capitalizing and amortizing R & D costs over future periods is consistent with the basic accounting concept of matching expenses with revenues (matching principle), it is inconsistent with the basic accounting goal that accounting should be reasonably objective. Additionally, it is not in accord with the "conservatism" concept, i.e., that less optimistic estimates should be used. In promulgating Financial Accounting Statement (FAS) number 2, the FASB concluded that the latter considerations were more important than the matching principle in regard to the treatment of R & D. R. ANTHONY & J. REECE, ACCOUNTING PRINCIPLES 183 (5th Ed.1983).

court finds that the modification activities are properly characterized as R & D. Therefore, the associated costs should have been expensed immediately and included in the firm fixed price bid portion of the contract. Plaintiff's treatment of these costs was not in accordance with GAAP. Consequently, under 32 C.F.R. § 201.2(iii) (1981), the costs are unallowable and unrecoverable.

However, plaintiff contends that the modification costs fit appropriately under ¶ 10(e) of FAS 2, which excludes "research and development adaptation of an existing capability to a particular requirement or customers need as part of a continuing commercial activity" from the scope of FAS 2, thereby making plaintiff's treatment of the costs appropriate. FASB, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS No. 2, ¶ 10(e) (October 1974). The court disagrees and finds instead that FAS 2 ¶ 9 is applicable because of its examples of R & D activities which include: modification of the formulation or design of a product or process; design, construction and testing of preproduction prototypes and models; engineering activity required to advance the functional and economic requirements and is ready for manufacture. FASB, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS No. 2, ¶ 9 (October 1974). The court determines that the examples in FAS 2 ¶ 9 are a far more accurate description of the modification activities of plaintiff than the exception described in FAS 2 ¶ 10(e).

Plaintiff also argues that the court should defer to the professional judgment of an accountant who has selected one of several "reasonable alternatives" under GAAP. In support, plaintiff cites to *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979), which discusses the various and acceptable practices permitted under GAAP for "valuing inventories, depreciating assets and amortizing goodwill and the like" *Thor* at 544 n. 22, 99 S.Ct. at 787 n. 22 (citation omitted). For these particular types of assets, GAAP still does in fact "tolerate a range of 'reasonable' treatments leaving the choice among alternatives to management." *Thor* at 544, 99 S.Ct. at 787. However, in 1975, the generally accepted treatment of R & D was standardized under FAS 2 which required these costs to be expensed in the period of their occurrence. Any accounting method for R & D activities within the scope of FAS 2 that does not expense these costs when incurred (such as plaintiff's method), is not a "reasonable alternative" under GAAP.[15]

Finally, in support of its contention that the modification costs are allowable, plaintiff cites extensively to *Northrup Corp.*, ASBCA No. 14763, 72–1 BCA (CCH) ¶ 9344 (Feb. 29, 1972), and *Consolidated Airborne Sys.*, ASBCA No. 20273, 78–1 BCA (CCH) ¶ 13,068, 1978 WL 2070 (Feb. 28, 1978). In *Northrop Corp.*, there was a longstanding, written accounting policy to defer such costs that was in effect when *Northrop* bid on its contract. In contrast, plaintiff has failed to establish the existence of such a policy. Plaintiff admits that it does not have a written policy. Moreover, the operative facts in *Northrup* and *Consolidated* predate the promulgation of FAS 2 and consequently the accounting principles that may have been approved in these cases no longer constitute GAAP for the treatment of R & D in cases governed by FAS 2 (such as the case at bar).

### Conclusion

For the reasons stated above, plaintiff's claim for recovery of the sum of $153,915.00 for costs incurred in producing a first article for defendant is denied. Accordingly, defendant's cross-motion for summary judgment is granted and plaintiff's motion for summary judgment is denied.

The Clerk is directed to dismiss plaintiff's complaint. No costs.

---

**15.** It follows that this court is not required to defer to an accountant's judgment if it is con-
trary to FAS 2.