**AYDIN CORPORATION (WEST), Appellant,**

v.

**Sheila E. WIDNALL, Secretary of the Air Force, Appellee.**

No. 94–1441.

United States Court of Appeals, Federal Circuit.

Aug. 10, 1995.

**1574**

Peter B. Jones, Jones & Donovan, Irvine, CA, argued for appellant.

Geoffrey C. Cook, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for appellee. With him on the brief were Frank W. Hunger, Asst. Atty. Gen. and David M. Cohen, Director.

Before ARCHER, Chief Judge, MAYER, and RADER, Circuit Judges.

Opinion of the court filed by Circuit Judge RADER. Concurring in part and dissenting in part opinion filed by Circuit Judge MAYER.

RADER, Circuit Judge.

Aydin Corporation appeals from a decision of the Armed Services Board of Contract Appeals. *Aydin Corp. (West),* 94–2 B.C.A. (CCH) ¶ 26,899, 1994 WL 159377 (1994). Aydin appeals the Board's denial of its equitable adjustment claim seeking reimbursement for the cost of complying with an order from the contracting officer who administered Aydin's contract to change its method of cost allocation and billing. *Id.* at 133,924–25. Aydin also appeals the Board's denial of its request for reimbursements related to (i) a large sales commission on a foreign contract, (ii) costs of building a demonstration radar, and (iii) certain unabsorbed overhead costs. *Id.*

at 133,936–37, 133,941, 133,944. This court affirms-in-part, reverses-in-part, and remands.

## BACKGROUND

The Board—making very feeble attempts to separate relevant facts from the vast minutiae associated with any large Government contract—provided an exhaustive recitation of facts. *Id.* at 133,919–23, 133,925–33, 133,-937–40, 133,941–43. This court reproduces only those facts relevant to this appeal.

### I.

In 1987, the United States Air Force awarded Aydin a multi-year, firm-fixed-price requirements contract (Contract No. F04606–87–D–0002) for Multiple Threat Emitter Systems (MUTES). MUTES are ground-based radar simulators which evaluate airborne radar warning systems, test electronic warfare countermeasure systems, and train pilots. The contract called for the production of a "best estimated quantity" of nine MUTES, and up to five additional MUTES, over five years. To order MUTES, the contracting officer handling procurement issued delivery orders. To date, the contracting officer has issued thirteen delivery orders, nine involving manufacture of MUTES or MUTES subparts.

The MUTES contract directed the Government to pay Aydin in the form of progress payments according to Aydin's incurred costs: "Each progress payment shall be computed as ... eighty percent (80%) of the Contractor's cumulative total costs under this contract...." 48 C.F.R. § 252.232–7007 (Jan. 1986) (deviation), *reprinted in* 51 Fed. Reg. 6,284, 6,286–88 (Feb. 21, 1986). Aydin accumulated its contract costs as costs of a single contract and then allocated that total equally among the delivery orders based on contracted MUTES units. Aydin therefore requested progress payments as a percentage of its cumulative total costs on the overall MUTES contract.

The contracting officer objected to Aydin's cost allocation and billing practice. The contracting officer viewed each delivery order as a separate contract. Accordingly, the con-

tracting officer ordered Aydin to segregate its costs by delivery order and to submit separate progress payment requests for each delivery order. In 1990, after several rounds of correspondence between the contracting officer and Aydin, the contracting officer stopped progress payments to Aydin. The contracting officer refused to resume them until Aydin segregated its costs and issued progress payment requests by delivery order. After Aydin changed its accounting system, the contracting officer resumed progress payments. Aydin incurred significant administrative and production costs in implementing the cost segregation requirements imposed by the contracting officer. Aydin submitted an equitable adjustment claim for those increased costs. The contracting officer denied the claim; Aydin appealed to the Board.

The Board denied Aydin's claim. *Aydin*, 94–2 B.C.A. (CCH) at 133,924–25. The Board found that the contracting officer properly considered each delivery order a separate contract. *Id.* The Board determined that segregation by delivery order was consistent with the contract and the applicable federal regulations. *Id.; see also* 48 C.F.R. § 32.503–5 (1987). Thus, according to the Board, the cost segregation requirement made no constructive change to the MUTES contract for which Aydin could obtain an equitable adjustment. *Aydin*, 94–2 B.C.A. (CCH) at 133,925.

## II.

The Government also disallowed certain indirect costs from Aydin's progress payment requests. The Government excluded (i) a large sales commission on a foreign contract, (ii) costs to build a demonstration radar, and (iii) certain unabsorbed overhead costs.

## A.

Aydin, like most contractors, maintains sales agents around the world and pays them sales commissions on both Government and commercial, and both foreign and domestic, contracts. Aydin includes the stipends and sales commissions paid to its agents in its general and administrative (G & A) expense pool.

In 1988, Aydin sold an electronic system called "SOLAR II" to the Argentine Government for over $25 million. Of $4.3 million in total sales commissions in 1989, Aydin incurred liabilities of about $3.7 million to its foreign sales agents in commissions from the SOLAR II sale. Aydin included the cost of the SOLAR II sales commissions in its G & A expense pool, thus allocating a portion of those costs to the MUTES contract. The Defense Contract Audit Agency (DCAA) found a disparity between the large size of the 1989 sales commissions for the SOLAR II contract and the minimal impact upon the MUTES contract overhead rate.

DCAA concluded that Aydin's inclusion of the SOLAR II sales commission in its 1989 G & A expense pool violated Cost Accounting Standards (CAS) 410 and 418. Therefore, DCAA removed about $3.6 million from the pool. DCAA removed another $3.6 million from Aydin's 1990 G & A expense pool to adjust for the 1990 sales commissions on the SOLAR II contract. Aydin sought reimbursement of the amount it would have received if the DCAA had not adjusted the G & A expense pools. The contracting officer denied the claim; Aydin appealed to the Board.

Because the SOLAR II sales commissions were not "incurred for the management and administration of Aydin as a whole," the Board first determined that Aydin's sales commissions were not G & A expenses as defined in CAS 410, 4 C.F.R. § 410.30(a)(6) (1987). *Aydin*, 94–2 B.C.A. (CCH) at 133,-935. Next the Board noted that, under CAS 410.50(c), " '[e]xpenses which are not G & A expenses and are insignificant in amount may be included in the G & A expense pool for allocation to final cost objectives.' " *Id.* (quoting 4 C.F.R. § 410.50(c) (1987)). The Board found that Aydin's 1989 sales commissions were not insignificant. *Id.* Finally, the Board determined that Aydin's inclusion of the SOLAR II sales commissions in its G & A expense pool would result in inequitable distribution of those commissions to Government contracts. *Id.* The Board found that Aydin could continue to charge its sales commissions, including its foreign sales commis-

sions, to its G & A expense pool. *Id.* at 133,936. However, the SOLAR II sales commission required different treatment:

> With the Solar II commission representing over 91 percent of the total 1989 sales commissions, and the Solar II contract representing only 19 percent of Aydin's 1989 G & A base, the MUTES contract was receiving significantly less benefit from the Solar II commission in relation to other final cost objectives. For the MUTES contract G & A rate to be commensurate with the benefits received, Aydin may account for the MUTES G & A rate by means of special allocation as provided under [4 C.F.R. § 410.50(j) (1987)].... [T]he special allocation requires, among other adjustments, an adjustment to Aydin's total cost input base.

*Id.* The Board found this approach consistent with CAS 410.40(d) which allows non-G & A expenses classified as G & A expenses to remain in the G & A expense pool, unless "they can be allocated to business unit cost objectives on a beneficial or causal relationship." *Id.* (quoting 4 C.F.R. § 410.40(d) (1987)).

Because the SOLAR II commission could be handled by special allocation, the Board concluded that, under CAS 410.40(d), that sales commission could not remain in Aydin's G & A expense pool. *Id.* at 133,936. The Board further held that Aydin would not violate CAS 402 by directly assigning the sales commission to the SOLAR II contract. *Id.* at 133,935. The Board ultimately instructed Aydin to reassign the sales commission on the SOLAR II contract as a direct expense and approved DCAA's deduction of that amount from Aydin's G & A expense pool to account for the reassignment.

### B.

In 1983, Aydin contracted with Prutech Research and Development Partnership to develop a three-dimensional radar system. The money budgeted for research and development (R & D) ran out while Aydin was still in the "breadboarding" phase of development. Therefore, Aydin built a demonstration radar with between $3.0 and $4.5 million of its own funds during 1986 and 1987. Ay-

din treated the demonstration radar as a capital asset and depreciated its costs over a five-year period. Aydin included the depreciation costs in its G & A expense pool, a portion of which Aydin allocated to the MUTES contract.

In 1989, a DCAA audit questioned Aydin's treatment of the demonstration radar costs. DCAA concluded that the demonstration radar costs were independent research & development (IR & D) expenses and should have been expensed in 1986 and 1987. Because FAR 31–205.18(d)(1), 48 C.F.R. § 31.205–18(d)(1) (1987), classifies IR & D costs incurred in previous accounting periods (or deferred IR & D costs) as unallowable, DCAA eliminated the demonstration radar costs from Aydin's 1988 G & A expense pool. Once again, Aydin appealed the contracting officer's denial of a full reimbursement.

The Board upheld the reduction. *Aydin,* 94–2 B.C.A. (CCH) at 133,941. The Board concluded that, under FAR 31.205–18, Aydin's demonstration radar costs "were chargeable in the years (1986 and 1987) incurred, and not chargeable as depreciation through G & A in 1988 or in subsequent years." *Id.*

### C.

In 1988, Aydin submitted a late Government-furnished equipment (GFE) claim seeking in part unabsorbed overhead costs from an alleged Government-caused delay. In June 1989, Aydin and the Government modified the MUTES contract to settle the claim. The modification (Modification P00013) added contract line item number 0013 (CLIN 0013) to the MUTES contract. CLIN 0013 authorized payment of $1,738,850 for Aydin's unabsorbed overhead costs-and included a special payment provision:

> *SPECIAL PAYMENT PROVISION CONTRACTOR IS TO RECEIVE IMMEDIATE PAYMENT UPON INVOICE AS CITED ON A DELIVERY ORDER. NO LIQUIDATION OF PROGRESS PAYMENTS ARE APPLICABLE TO CLIN 0013.

The Government paid Aydin $2.5 million in total settlement on the late GFE claim.

In May 1989, the parties executed another modification (Modification P00012) to the MUTES contract. Aydin submitted an equitable adjustment claim to account for the changes made by Modification P00012 to the contract specification. In June 1990, the parties settled the claim for $21,884,400 and again modified the contract. That modification (Modification P00015) increased the Government's payment under CLIN 0013 by $3 million for unabsorbed overhead costs.

After payment of the settlement amounts to Aydin, the contracting officer deducted $1.6 million and $2.8 million from Aydin's indirect cost pools. The deducted sums represented the unabsorbed overhead recovered by Aydin under CLIN 0013 as part of the two settlements. These deductions reduced the Government's progress payments to Aydin. Aydin challenged the deductions. The contracting officer denied Aydin's claim for reimbursement of the deducted sums; Aydin appealed to the Board.

The Board found that the contracting officer properly reduced Aydin's indirect cost pools, and therefore the progress payments, by the amount of unabsorbed overhead already paid as part of the claim settlements. *Aydin*, 94-2 B.C.A. (CCH) at 133,944.

## DISCUSSION

■ The Board's interpretation of the MUTES contract, including whether it incorporates certain FAR provisions, is a matter of law for *de novo* review. 41 U.S.C. § 609(b) (1988); *see R.B. Wright Constr. Co. v. United States*, 919 F.2d 1569, 1571 (Fed. Cir.1990). This court also reviews the Board's interpretation of the FAR provisions incorporated into the MUTES contract *de novo*, with some deference afforded the Board's expertise in interpreting contract regulations. *See SMS Data Prods. Group, Inc. v. United States*, 900 F.2d 1553, 1555 (Fed.Cir.1990).

### I.

■ Where it requires a constructive change in a contract, the Government must fairly compensate the contractor for the costs of the change. *See J.B. Williams Co. v. United States*, 450 F.2d 1379, 1394, 196 Ct. Cl. 491 (1971). To identify a constructive change, this court consults the contract language.

■ The "Progress Payments" clause of the contract provides: "each progress payment shall be computed as . . . eighty percent (80%) of the Contractor's *cumulative total costs under this contract.*" 48 C.F.R. § 252.232–7007(a) (emphasis added). The language "cumulative total costs under this contract" refers to the entirety of the MUTES contract. Nothing in the clause directs Aydin to segregate its costs by delivery order. To the contrary, the clause focuses on "cumulative total costs" from delivery order to delivery order "under this contract." Moreover, the "Ordering" clause of the MUTES contract distinguishes "this contract" from a delivery order:

(a) Any supplies and services to be furnished under *this contract* shall be ordered by issuance of delivery orders. . . .

(b) All delivery orders are subject to the terms and conditions of *this contract.* In the event of conflict between a delivery order and *this contract, the contract* shall control.

48 C.F.R. § 52.216–18 (1987) (emphasis added). Clearly, "this contract" refers to the overall contract. In sum, the language of the MUTES contract authorized Aydin to bill its costs on the overall MUTES contract without segregating them by delivery order.

The MUTES contract also does not incorporate regulations requiring Aydin to revamp its standard accounting practice of billing costs based on the overall contract. The Board erred in its principal reliance on FAR 32.503–5, a section of FAR Part 32. *See* 48 C.F.R. § 32.503–5 (1987). It relied on FAR 32.503–5 to endorse treating each delivery order as a separate contract. *Aydin*, 94-2 B.C.A. (CCH) at 133,924–25. The MUTES contract, however, does not expressly or impliedly incorporate FAR 32.503–5.[1] The

---

1. Even if the contract incorporated FAR 32.503–5(c), that regulation does not conclusively require cost segregation. *See* 48 C.F.R. § 32.503–5(c)(1), (2) (1987). The regulation does not di-

MUTES contract does incorporate FAR 52.232–13, entitled "Notice of Progress Payments," which in turn mentions a subpart of FAR Part 32:

> The need for customary progress payments conforming to the regulations in subpart 32.5 of the [FAR] will not be considered as a handicap or adverse factor in the award of the contract.

48 C.F.R. § 52.232–13 (1987). Far from incorporating FAR Part 32 wholesale into the contract, this regulation merely reassures the contractor that it will suffer no penalty for relying on progress payments to perform the contract. This language does not expressly incorporate FAR Part 32 under which FAR 32.503–5 falls.

The MUTES contract does not impliedly incorporate FAR 32.503–5 either. The Board found that Aydin's obligation to follow FAR 32.503–5 derived from the "Progress Payments" clause. *Aydin,* 94–2 B.C.A. (CCH) at 133,924. The "Progress Payments" clause states in part: *"Control of costs and property.* The contractor shall maintain an accounting system and controls adequate for the proper administration of this clause." 48 C.F.R. § 252.232–7007(f). This language on its face does not require segregation of costs by delivery order.

In conjunction with the "Progress Payments" clause, the Board relied on several circumstances, including Aydin's practice of treating each delivery order as a separate contract in performing the contract, to support administration of the MUTES contract by delivery order. *Aydin,* 94–2 B.C.A. (CCH) at 133,924. These considerations, however, do not override the explicit terms of the MUTES contract directing payment of "eighty percent (80%) of the Contractor's cumulative total costs under *this contract."* 48 C.F.R. § 252.232–7007(a) (emphasis added). Aydin complied with this contract clause in computing progress payments as a percentage of its cumulative total cost of the overall MUTES contract.

The "Notice of Progress Payments" clause, FAR 52.232–13, authorized the contracting officer to stop progress payments if Aydin's accounting method proved inadequate:

> Even though the [progress payments] clause is included in the contract, the clause shall be inoperative during any time the contractor's accounting system and controls are determined by the Government to be inadequate for segregation and accumulation of contract costs.

48 C.F.R. § 52.232–13. The contracting officer thus could require modification of Aydin's accounting system, but with the attendant obligation to compensate for the costs of this constructive change in the contract. *See J.B. Williams Co.,* 450 F.2d at 1394. Thus, the Board erred in denying Aydin's equitable adjustment claim. This court reverses.

## II.

### A.

■■■■ Turning to the SOLAR II sales commission issue, this court first reviews whether CAS applies to the MUTES contract. Where CAS applies, it governs the allocability of costs. *United States v. Boeing Co.,* 802 F.2d 1390 (Fed.Cir.1986). For contracts covered by CAS, a contractor must follow certain cost accounting methods. CAS ensures that a beneficial relationship exists between a cost and the contract bearing an allocated portion of that cost.

■■■■ The MUTES contract includes FAR 52.230–3 entitled "Cost Accounting Standards." 48 C.F.R. § 52.230–3 (1984). Under FAR 52.230–3(a)(3), Aydin must "[c]omply with all CAS in effect on the date of award of this contract[,]" unless Aydin qualifies for one of several regulatory exemptions. 4 C.F.R. § 331.30(b)(9) (1987) exempts from CAS coverage

> [a]ny firm fixed price contract or subcontract awarded without submission of any

---

rect contractors to use a particular method of billing progress payments, but at most establishes a preference for cost segregation. *Id.* In addition, the regulation explicitly discourages progress payment requests based on total contract costs only in two circumstances—where delivery orders are subject to different liquidation rates or are administered by different payment offices. *See* 48 C.F.R. § 32.503–5(c)(3)(i), (ii) (1987). Neither condition applies to the MUTES contract.

cost data: *Provided,* That the failure to submit such data is not attributable to a waiver of the requirement for certified cost or pricing data.

*Id.* Thus, the applicability of CAS to this MUTES contract depends on whether Aydin submitted "any cost data" in seeking award of the contract.

Before award of the MUTES contract, the contracting officer required Aydin to submit informal cost information, including material costs, engineering and manufacturing labor hours for production of the first MUTES unit, and indirect cost data. The contracting officer sought this information to check for mistakes or major omissions in offers, not to negotiate price. Nonetheless, this informal cost information qualifies as "any cost data" under section 331.30(b)(9).

The language of the regulation encompasses broadly "any cost data." The modifier "any" sweeps all types of cost data within the coverage of the regulation, including informal cost data. Moreover, the appearance of the narrower phrase "cost and pricing data" later in the regulation indicates that "cost data" covers more than the "cost and pricing data" in negotiations. The MUTES contract thus does not fall within the exemption under section 331.30(b)(9) and, consequently, is covered by CAS.

The history of the promulgation of section 331.30(b)(9) supports this court's interpretation. *See Nolan Bros., Inc. v. United States,* 437 F.2d 1371, 1377, 194 Ct.Cl. 1 (1971) (drafting of regulation serves as useful interpretation aid). The Cost Accounting Standards Board (CASB), the agency charged with promulgating CAS provisions, initially favored restricting "any cost data" in section 331.30(b)(9) to price negotiation data. 45 Fed.Reg. 8,678 (Feb. 8, 1980). In response to comments during revision of the regulation, however, the CASB explicitly declined to restrict "any cost data" to cover only data "relied on as the basis of price." 45 Fed. Reg. 62,009 (Sept. 18, 1980). Thus, according to the CASB, "any cost data" means any cost data, regardless of whether the Government relies on the data to negotiate price.

Having determined that CAS applies to the MUTES contract, this court now must determine whether the Board correctly denied Aydin reimbursement of SOLAR II sales commission costs excluded from the progress payments. The Government may order prospective changes in a contractor's accounting practices upon a showing of potentially inequitable results. *See Litton Sys., Inc. v. United States,* 449 F.2d 392, 196 Ct.Cl. 133 (1971). However, in ordering such a change, the Government cannot impose on a contractor a requirement that forces the contractor to violate CAS 402, 4 C.F.R. § 402.40 (1987).

CAS 402 requires contractors to follow consistent accounting practices in classifying similar costs as direct or indirect. A contractor cannot charge a cost directly to one contract while charging similar costs to other contracts indirectly through overhead:

> All costs incurred for the same purpose, in like circumstances, are either direct costs only or indirect costs only with respect to [contracts].... [N]o [contract] shall have allocated to it as a direct cost any cost, if other costs incurred for the same purpose, in like circumstances, have been included in any indirect cost pool to be allocated to that or any other [contract].

4 C.F.R. § 402.40. When indirect allocation does not equitably distribute similar costs among existing contracts, CAS 402 provides the contractor with two accounting options:

> Whenever *costs which serve the same purpose* cannot equitably be indirectly allocated to one or more [contracts] in accordance with the contractor's disclosed accounting practices, the contractor may either: (1) Use a method for reassigning *all such costs* which would provide an equitable distribution to all [contracts], or (2) directly assign *all such costs* to [contracts] with which they are specifically identified.

4 C.F.R. § 402.50(d) (1987) (emphasis added). CAS 402.50(d) groups "all such costs" as "costs which serve the same purpose" and requires the contractor to treat them the same in its accounting practice.

The Board's holding—that all sales commissions could remain under Ay-

din's G & A expense pool, with the exception of the SOLAR II sales commissions—violates CAS 402. On the present record, this court sees no distinction between the SOLAR II sales commission costs and Aydin's sales commission costs other than dollar amount. CAS 402 requires similar treatment for similar costs. The DCAA, however, targeted one sales commission cost—the SOLAR II sales commission—for special treatment as a direct cost. By singling out the SOLAR II costs for exclusion from the G & A expense pool, the Government imposed a requirement on the contractor that conflicts with the requirements of CAS 402. *Cf. Reynolds Metals Co.*, 64 B.C.A. (CCH) ¶ 4,312, at 20,856 (1964). Regardless of the definition of "all such costs" (which conceivably could embrace all selling expenses, all sales commissions, or even all foreign sales commissions), the Government may not define "costs" so narrowly as to capture only one isolated cost item, even where that cost item is disproportionately large. Had the SOLAR II sales commission costs been incurred in different circumstances or for different purposes than the sales commission costs Aydin incurred for its other contracts, then direct assignment of the SOLAR II sales commission costs to the SOLAR II contract may have complied with CAS 402. *See* 4 C.F.R. § 402.60(b)(1), (2) (1987); *see also Boeing Co. v. United States*, 862 F.2d 290, 293 (Fed.Cir. 1988).

Because this court cannot discern from the Board's fact findings a basis for singling out the SOLAR II sales commission costs other than its large size, this court remands to the Board for a clearer explanation of that basis. The Board will have the opportunity to ex-

plain how the SOLAR II sales commission costs differ in purpose or circumstance from other sales commission costs, justifying different treatment of those costs.

### B.

The "Progress Payments" clause required compliance with generally accepted accounting principles (GAAP) and practices:

The Contractor shall not include the following in total costs for progress payment purposes. . . .

(i) Costs that are not reasonable, allocable to this contract, and consistent with sound and generally accepted accounting principles and practices.

48 C.F.R. § 252.232–7007(a)(3)(i). Therefore, this court consults GAAP to determine the proper treatment of Aydin's demonstration radar costs.

Aydin's development of the demonstration radar was an IR & D expense under GAAP. The Prutech agreement was a "Research and Development Partnership." In 1986 and 1987, Aydin merely completed the research tasks required under the Prutech contract. And, during that time, Aydin engaged in the testing and redesign of the demonstration radar unit—tasks associated with research and development.

■■■■ Under GAAP, Aydin cannot depreciate its IR & D costs. *See Denro, Inc. v. United States*, 19 Cl.Ct. 270, 278 n. 14 (1990). IR & D costs must be expensed when incurred. *Id.* at 278. Aydin thus had to expense its costs of building the demonstration radar in the years they were incurred, namely 1986 and 1987.[2] Aydin could not depreci-

---

**2.** While the Board's holding was correct, it erred in incorporating the cost principles of FAR Part 31 into the "Progress Payments" clause of the MUTES contract, 48 C.F.R. § 252.232–7007 (Jan. 1986) (deviation), *reprinted in* 51 Fed.Reg. 6,284, 6,286–88 (Feb. 21, 1986). The contract did not impliedly incorporate FAR Part 31. The Progress Payments clause expressly incorporated only FAR 31.205–10, 48 C.F.R. § 31.205–10 (1987), which is unrelated to the depreciation and expensing of capital assets.

The MUTES contract also contains FAR 252.231–7000 entitled "Supplemental Cost Principles":

When the allowability of costs under this contract is determined in accordance with Subpart 31.2 of the Federal Acquisition Regulations, the allowability of costs shall be determined by the Contracting Officer in accordance with Subpart 231.2 of the DoD Supplement in effect at the date of the contract.

48 C.F.R. § 252.231–7000 (1985). FAR 252.231–7000 however does not incorporate FAR Part 31 *in toto* into the MUTES contract. It simply states, that *when* Subpart 31.2 applies, the CO must also follow Subpart 231.2 of the applicable Department of Defense Supplement. FAR

ate those costs as G & A expenses in 1988 and subsequent years and indirectly charge them to the Government as part of the G & A rate. Because Aydin's treatment of those costs violated GAAP, the Board correctly denied Aydin's claim for costs of building the demonstration radar.

## C.

■ Finally, this court reviews the Board's ruling on Aydin's unabsorbed overhead costs. The Government made immediate and direct payment to Aydin of unabsorbed overhead under CLIN 0013 as part of two claim settlements. The Board determined that Aydin could not collect a direct payment of overhead costs and then bill the Government for those same costs in its progress payment requests by including them in its indirect cost pools. In other words, Aydin cannot recoup indirectly what the Government has already paid it directly. Aydin did not meet its burden to show the Board committed a reversible error on this point. Thus, this court sustains the Board's determination that the Government properly deducted the settlement amounts from Aydin's indirect cost pools.

## CONCLUSION

This court reverses the Board's denial of Aydin's equitable adjustment claim for costs incurred in changing its accounting system to segregate costs by delivery order. That change amounts to a constructive change to the MUTES contract for which the Government must compensate Aydin.

This court remands on the issue of Aydin's claim for reimbursement of SOLAR II sales commission costs. This court directs the Board to explain how the SOLAR II sales commission costs differ in purpose or circumstance, if at all, from the other sales commission costs.

This court affirms the Board's denial of Aydin's claim for costs to build the demonstration radar because those costs were IR & D costs that Aydin should have expensed in the years incurred.

Part 31, therefore, does not govern the treatment

Finally, because Aydin has failed to persuade this court that the Government improperly deducted the CLIN 0013 settlement amounts from Aydin's indirect cost pools, this court affirms the Board's denial of Aydin's claim for that amount.

## COSTS

Each party shall bear its own costs.

AFFIRMED–IN–PART, REVERSED–IN–PART, and REMANDED.

MAYER, Circuit Judge, concurring in part and dissenting in part.

I would affirm the board's decision in its entirety. Therefore, I dissent from Parts I. and II.A. of the opinion.

In Part I, the court concludes that the contracting officer constructively changed the MUTES contract by requiring Aydin to segregate its costs by delivery order. It holds that the contract did not incorporate FAR 32.503–5, and focuses on the "Progress Payments" clause of the contract, which provides that "each progress payment shall be computed as ... eighty percent (80%) of the Contractor's cumulative total costs under this contract."

The contract contains FAR clause 52.232–13 (April 1984), which emphasizes "[t]he need for customary progress payments conforming to the regulations in subpart 32.5." Under subpart 32.5, "[g]enerally, progress payments made under multiple-order contracts should be administered under each individual order as if the order constituted a separate contract." 48 C.F.R. § 32.503–5(c)(1). Clause 52.232–13 also states that the "Progress Payments" clause "shall be inoperative during any time the contractor's accounting system and controls are determined by the Government to be inadequate for segregation and accumulation of contract costs." This was a requirements contract, which did not in itself authorize Aydin to manufacture MUTES or obligate any governmental funds. The board credited the contracting officer's testimony, based on 25 years of experience, that he had "never seen" such a contract "where the contractor was not required or was not seg-

of Aydin's radar costs.

regating costs by Delivery Order." The board concluded that "these considerations required each delivery order be administered as though it was a separate contract." I would not disturb that conclusion.

In Part II.A., the court remands for an explanation of the difference between the SOLAR II sales commission costs and other sales commission costs, without deciding whether the board properly held that Aydin was required to exclude these foreign sales commissions from its progress payment requests. I agree with the analysis of whether the contract is covered by the CAS, and the conclusion that it is. However, I disagree with the court's premise that the SOLAR II sales commission costs must differ in purpose or circumstance from other sales commission costs, rather than just in size. Relative size of the commissions is relevant when considering whether it is proper to attribute these sales commissions to the contract. *See FMC*

*Corp. v. United States,* 853 F.2d 882, 886 (Fed.Cir.1988); *see also Lockheed Aircraft Corp. v. United States,* 375 F.2d 786, 794, 179 Ct.Cl. 545 (1967) ("[T]he burden will be on the contractor to show the benefit and a reasonable allocation among different government contracts and between government and commercial work generally."). Here, the SOLAR II commissions represented more than 91% of the total sales commissions for 1989, but only 19% of Aydin's G & A base. Thus, the board properly concluded that Aydin had not proved that it was equitable to allocate these commissions to the contract.